**AFFIDAVIT IN SUPPORT OF
SEIZURE WARRANT APPLICATION**                    2:26mj118 CMR

I, Bret Curtis, Special Agent, Federal Bureau of Investigation ("FBI"), being duly sworn, declare and state as follows:

**INTRODUCTION & PURPOSE OF THE AFFIDAVIT**

1.　I make this affidavit in support of an application for the issuance of a seizure warrant to seize all funds in, or drawn from, US Bank account number 153198216811 (USB 6811) held in the name of Marcelo Barreto Meirinho, and transferred to US Bank Cashier's Check 3916514418 (TARGET ASSET).

2.　The TARGET ASSET is believed to be the proceeds of violations of Title 18 U.S.C. § 1341 (Wire Fraud) and 18 U.S.C. § 1956(a)(1)(B)(i) (Concealment Money Laundering) involving a cryptocurrency investment scam. For the court to authorize seizure of the TARGET ASSET, it must find probable cause to believe that: (1) the crimes of Wire Fraud and/or Concealment Money Laundering were committed; and (2) the TARGET ASSET has a connection to those offenses in the manner specified by the below statutes authorizing forfeiture.

3.　For the reasons set forth below, there is probable cause to believe the TARGET ASSET has a connection to Wire Fraud and Concealment Money Laundering and are subject to **civil seizure and forfeiture** under the following forfeiture authorities:

   a.　Pursuant to 18 U.S.C. § 981(a)(1)(C) because the TARGET ASSET is property, real or personal, which constitutes or is derived from proceeds traceable to a Wire Fraud scheme. Section 981(a)(1)(C) provides for the civil forfeiture of any property, real or personal, which constitutes or is derived from proceeds from any offense constituting a "specified unlawful activity" as defined in 18 U.S.C. § 1956(c)(7), or a conspiracy to commit such offenses. A "specified unlawful

      activity," as defined in Section 1956(c)(7), includes offenses listed in 18 U.S.C. § 1961(1). Section 1961(1) includes Wire Fraud violations.

    b. Pursuant to 18 U.S.C. § 981(a)(1)(A) because the TARGET ASSET was involved in Concealment Money Laundering or is traceable to such property.

    c. Consequently, seizure of the TARGET ASSET for civil forfeiture is authorized by 18 U.S.C. § 981(b).

4. For the reasons set forth below, there is probable cause to believe the TARGET ASSET is subject to **criminal seizure and forfeiture** as follows:

    a. Pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c) because the TARGET ASSET is property, real or personal, which constitutes or is derived from proceeds traceable to a violation of 18 U.S.C. § 1343 (Wire Fraud).

    b. Pursuant to 18 U.S.C. § 982(a)(1) because the TARGET ASSET was involved in Concealment Money Laundering or is traceable to such property.

    c. Consequently, seizure of the TARGET ASSET for criminal forfeiture is authorized by 21 U.S.C. § 853(f) and 18 U.S.C. § 982(b).

5. In tracing funds for civil forfeiture, the United States may rely on 18 U.S.C. § 984. This statute provides that it is not necessary for the Government to trace fungible property, like funds in a bank account, in connection with forfeiture proceedings commenced within one year of the date of the offense. Section 984 allows the Government to seize the full amount of illicit proceeds originally deposited into an account during the look back period regardless of whether the government can establish, such as through direct tracing, that the fraud proceeds remain in the account on the seizure date. As a result, under Section 984 the Government can seize more than just the directly traceable proceeds that remain in the account.

6. With respect to seizure for criminal forfeiture, 21 U.S.C. § 853(f) provides that a court may issue a criminal seizure warrant when it "determines that there is probable cause to believe that the property to be seized would, in the event of conviction, be subject to forfeiture and that a protective order under 21 U.S.C. § 853(e) may not be sufficient to assure the availability of the property for forfeiture." There is a substantial risk that the TARGET ASSET will be withdrawn, moved, dissipated, or otherwise become unavailable for forfeiture unless immediate steps are taken to secure it through a seizure warrant. As funds in a bank account, the TARGET ASSET is inherently portable and fungible. Based on my training and experience, I know that restraining orders served on banks sometimes fail to preserve the property for forfeiture because the bank representative receiving the restraining order fails to put the necessary safeguards in place to freeze the money in time to prevent the account holder from accessing the funds electronically, or fails to notify the proper personnel as to the existence of the order, or the bank exercises its own right of setoff to satisfy an outstanding debt owed to the bank by the account holder. In contrast, where electronic funds in an account are concerned, a seizure warrant guarantees that the funds will be preserved for forfeiture once the warrant is served.

### **RELEVANT CRIMINAL STATUTES**

7. Title 18 U.S.C. § 1343 states:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio or television communication in interstate or foreign commerce, any writings, signs, signals, pictures . . . for the purpose of executing such scheme or artifice.

8. Title 18 U.S.C. § 1956(a)(1)(B)(i) states:

> Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—

   (B) knowing that the transaction is designed in whole or in part—

     (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity.

## BACKGROUND OF AFFIANT

9. I am a Special Agent with the FBI in Salt Lake City, Utah. I have been an FBI Special Agent since February 22, 2004. In my capacity as a Special Agent with the FBI, I have conducted and participated in numerous official investigations into mail and wire fraud, money laundering and other financial and computer crimes as well as drug trafficking crimes. I am a graduate of the FBI Training Academy in Quantico, Virginia and have also attended advanced training classes in the areas of white-collar crime.

10. As an FBI Special Agent, I am familiar with the use of financial accounts by those who operate fraudulent schemes, and the types of transactions reflected on financial account records. I am also familiar with the principles of tracing assets into and through financial accounts.

11. The facts set forth in this affidavit are based on my personal observations, my training and experience, my review of documents, and interviews with witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested seizure warrant and does not purport to set forth all my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## FACTS

12. This case involves the investigation of the TARGET ASSET consisting of proceeds from what is commonly known as an investment scam or scheme. My investigation revealed that USB 6811 was used to receive fraudulent proceeds from victims of an online investment scam.

13. <u>Online Investment Schemes</u>. My investigation has revealed that fraudsters created and coordinated the use of fake online personas, and then used those fake online profiles or personas to engage in online chats, text messaging, and other forms of communication, with unwitting victims in order to trick the victims into believing they were involved in a real and lucrative investment opportunity. After gaining the victims' trust, the fraudsters then directed the victims to send their own personal funds to the fraudsters.

14. Victim #1. Victim #1, age 82, resides in Gallatin, Tennessee and fell victim to an investment scam in which he believed he was sending money to an investment company to retrieve more than $950,000 he was told he earned through a fraudulent online investment.

15. In approximately October 2023, Victim #1 was contacted on the Messenger App by an individual claiming to be Elon Musk. Eventually, they moved their discussions to Telegram and then to WhatsApp. All of Victim #1's communications with Musk were text communications. The individual claiming to be Musk introduced Victim #1 to an investment platform called Coin Gecko. Musk informed Victim #1 that he could use the Coin Gecko platform to invest in Tesla stock. As a result of his conversations with Musk, Victim #1 closed an account he had with Affleck in which he had $4,000 to $5,000 dollars. Victim #1 used a portion of these funds to invest through Coin Gecko to purchase Tesla stocks. Victim #1 watched his investment grow on the fraudulent Coin Gecko account to the point where it reached $950,000.

16. Victim #1 decided that he wanted to withdraw earnings from his Coin Gecko account. Victim #1 attempted approximately 10 to 12 times to remove earnings, but he was given several excuses as to why funds could not be removed. In these interactions, Victim #1 did not speak with Musk, but rather with Musk's team, which consisted of several young men who he thought sounded Chinese.

17. Eventually someone claiming to be Marcelo Meirinho (who is from Brazil), a representative of Musk, communicated with Victim #1 via text using WhatsApp number (682) 321-3608. The person claiming to be Meirinho told Victim #1 to mail $50,000 to Meirinho at his Midvale, Utah address. On December 4, 2025, Victim #1 mailed a check to Meirinho in the amount of $50,000. Victim #1 mailed the check via FedEx and paid extra so it would be delivered to Meirinho the next day, on December 5, 2025. The memo on the JP Morgan Chase Cashier's Check for $50,000 made out to Meirinho read, "For release and transfer of stock." This check was not for investment purposes, but rather to pay for the release of the funds in the Coin Gecko account and to have them transferred to his personal bank account.





18. As further described below, there is probable cause to believe the $50,000 check was deposited into USB 6811. Despite this payment, Victim #1 was still not allowed to withdraw money from his Coin Gecko account. In my training and experience, I have learned it is common for fraudsters in investment scams like the one described here to tell victims that they need to pay taxes and fees to withdraw money from fraudulent investment platforms like Coin Gecko. The fraudsters dangle huge profits and large fraudulent balances in front of the victims as an enticement to convince them to send more money, which the fraudsters can steal.

19. A warrant for Meirinho's arrest was placed into NCIC by the Brunswick County Sheriff's Office (BCSO) in North Carolina in September 2025. As part of BCSO's investigation, Meirinho was interviewed on September 22, 2025, and asked about fraud proceeds he collected from a North Carolina victim. Meirinho told BCSO investigators he collected money from people as part of a crypto investment he was involved in. On September 22, 2025, BCSO investigators told Meirinho the money he collected came from fraud victims.

20. On February 2, 2026, Meirinho was arrested and interviewed at the Midvale Police Department in Midvale, Utah. Meirinho said he met a female online in 2022. Meirinho refused to identify this female. The female told Meirinho she had a large debt. The female asked Meirinho if she could have people send money to his bank accounts to help her pay off her debt. She agreed to pay Meirinho a 3% commission for the money he collected for her. After Meirinho collected money for the female, the female would direct Meirinho to buy cryptocurrency with the money and transfer it to a virtual wallet. Meirinho refused to provide information about the wallets he transferred money to.

21.  Meirinho said recently he received several packages full of cash in the mail. When he received the cash, the female would tell him to buy cryptocurrency with it. Meirinho admitted he made the following cash deposits totaling $90,000 to USB 6811, with cash and checks that were mailed to him:

- 12/24/2025 $15,000
- 12/26/2025 $15,000
- 12/29/2025 $15,000
- 12/31/2025 $15,000
- 01/02/2026 $15,000
- 01/05/2026 $15,000

22.  Meirinho said after he deposited the money to USB 6811, he purchased crypto currency with it. Meirinho refused to provide information about any of the people who mailed him money.

23.  I reminded Meirinho that between September 10, 2025, and November 28, 2025, I knew he collected more than $2,300,000 using his Wells Fargo account. Meirinho admitted he collected money using his bank accounts. Meirinho said Wells Fargo called him because someone from outside the country requested some of the money they wired to his account be returned because of fraud. Meirinho said his Wells Fargo account was closed as a result.

24.  Meirinho said he also collected money for the unknown female he met online using an account at Mountain America Federal Credit Union (MAFCU) and USB 6811. Meirinho said MAFCU closed the accounts he used to collect money with. Meirinho said US Bank complained about the cash deposits he made to USB 6811. Meirinho said he closed USB 6811 recently.

25.  I told Meirinho the money wired to his bank accounts, and mailed to his address, came from victims of fraud. I explained the reason the banks closed his accounts was because of the fraud. Meirinho said he did not care. Meirinho explained he had to make a living, and he did not care that his money came from victims of fraud.

9

26. The facts suggest that Meirinho was operating as a "money mule." A money mule is someone who transfers or moves illegally acquired money on behalf of someone else. In my training and experience, money mules add layers of distance between crime victims and criminals, insulate fraud perpetrators from scrutiny, and make it harder for law enforcement to accurately trace fraudulently obtained money.

27. On February 10, 2026, agents were given consent by the owner of the home Meirinho was staying at in Midvale, Utah prior to his arrest to retrieve bank records. The owner of the home is an older individual who lives in the home. Meirinho was a caretaker for the homeowner. Meirinho and the homeowner did not have a formal lease or rental agreement. Meirinho did not pay rent but was allowed to stay in the house in exchange for providing care to the homeowner. After the owner learned from me that Meirinho would not be returning because he was in the country illegally and will likely be deported, the homeowner called Meirinho's ex-wife. Meirinho's ex-wife came overo clean out the belongings Meirinho left behind in the bedroom Meirinho had been occupying. Those belongings included bank records, which the owner of the house and the ex-wife planned to throw away. The owner agreed to let the FBI look through the bank records before they threw them away.

28. Among the documents provided to the FBI was a bank statement showing a $50,000 deposit on December 5, 2025, to USB 6811. Given the timing, there is probable cause to believe this deposit is likely the $50,000 check Victim #1 sent Meirinho. The records provided to the FBI also included ten envelopes, four (4) labeled $15,000 and six (6) labeled $10,000 totaling $120,000. These envelopes are consistent with Meirinho's claim that he received cash in the mail that he deposited to USB 6811. There was also a US Bank Cashier's Check 3916514418 made out to Meirinho for $84,711.29. This substantiates Meirinho's claim that he closed USB 6811 and the

Cashier's Check likely represents the proceeds in USB 6811 paid out to Meirinho at the time USB 6811 was closed.

## CONCLUSION

29.     Given the deposit of Victim #1's check into USB 6811 and Meirinho's statements about using the account to receive funds that he would convert to cryptocurrency and send to an unknown female, and that this conduct has occurred during the last few months, there is probable cause to believe that the TARGET ASSET is subject to forfeiture in its entirety as either proceeds of funds fraudulently obtained by wire from unwitting victims (Wire Fraud) or property involved in Concealment Money Laundering.

I swear, under penalty of perjury, that the foregoing is true and correct.

_____
Bret Curtis, Special Agent
Federal Bureau of Investigation


Sworn and subscribed before me by reliable
electronic means this 20th day of February 2026.

_____
Cecilia M. Romero
Chief United States Magistrate Judge